## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

BRIAN LOMA; and
MIKEL WHITNEY

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, a municipality;
SERGEANT ANTHONY GUZMAN, in his individual and official capacities;
CORPORAL ADOLPH CHAVEZ JR., in his individual and official capacities;
CORPORAL FREDERICK KITCHENS, in his individual and official capacities;
DETECTIVE MICHAEL FELSOCI, in his individual and official capacities;
SERGEANT MICHAEL L. DANIELS, in his individual and official capacities; and
LIEUTENANT KENNETH D. CHAVEZ, in his individual and official capacities.

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Brian Loma and Mikel Whitney, by and through their attorneys David Lane and Helen Oh of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint and Jury Demand as follows:

### INTRODUCTION

1.  Just as the United States Supreme Court warned against in *Cohen v. California*, Denver Police Department ("DPD") officers have waged a war on the word "fuck" based on the content or viewpoint from which it is stated, while using "the most squeamish among us" to determine the bounds of First Amendment protection. 403 U.S. 15, 19 (1971).

1

2.  Plaintiffs Brian Loma and Mikel Whitney bring this action for the constitutional injuries they sustained on September 23, 2018 when Mr. Loma exercised his First Amendment right of free speech on a public sidewalk in the Sixteenth Street Mall calling for an end to the criminalization of homelessness. During his protest, Mr. Loma shouted, "fuck the police!" Upon hearing these words, DPD officers began contemplating whether Mr. Loma should be arrested for disturbing the peace. When Mr. Loma's shouting and profanity annoyed the sensibilities of a couple dining on a nearby restaurant patio that protrudes onto the public sidewalk, Defendants used the couples' complaint to, within minutes, arrest and jail Mr. Loma for his protected speech.

3.  Mr. Whitney observed Mr. Loma's protest and subsequent arrest. As a concerned citizen and friend of Mr. Loma's, Mr. Whitney took photos of the incident, believing the officers were committing illegal acts in retaliation against Mr. Loma for his protected speech. In his effort to gather information about the officers' misconduct, Mr. Whitney unsuccessfully attempted to take a photo of the complaining couple and their surroundings while standing on a public sidewalk from several yards away.

4.  This upset Defendants Anthony Guzman and Michael Felsoci, who demanded Mr. Whitney not take a picture of the couple. Mr. Whitney calmly stated that he did not take a picture and that he was walking away. Defendant Guzman retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well. As Mr. Whitney walk away, he stated, "I did not take a fucking picture."

5.   Upon hearing Mr. Whitney's statement, Defendants Guzman and Felsoci immediately arrested Mr. Whitney. While arresting him, Defendant Guzman told him to quit swearing.

6.   Both were jailed and charged with disturbing the peace, and both charges were ultimately dismissed. No objectively reasonable officer would have believed that Mr. Loma and Mr. Whitney committed any crime. Mr. Loma's and Mr. Whitney's rights under the First and Fourth Amendments to the United States Constitution were violated, as they were charged and arrested in retaliation for their protected speech, despite the fact that they had done nothing giving rise to probable cause to believe that they had violated any law.

## JURISDICTION AND VENUE

7.   This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.   Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

9.   Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

10.   At all times relevant to this complaint, Plaintiffs were citizens of the United States of America and residents of the State of Colorado.

11.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation.

12.     At all times relevant to this complaint, Defendant Sergeant Anthony Guzman was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

13.     At all times relevant to this complaint, Defendant Corporal Adolph Chavez Jr. was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

14.     At all times relevant to this complaint, Defendant Corporal Frederick Kitchens was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

15.     At all times relevant to this complaint, Defendant Detective Michael Felsoci was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

16.     At all times relevant to this complaint, Defendant Sergeant Michael L. Daniels was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

17.     At all times relevant to this complaint, Defendant Lieutenant Kenneth D. Chavez was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

## FACTUAL ALLEGATIONS

18.     Plaintiffs Brian Loma and Mikel Whitney are friends and outspoken advocates for the homeless through their pursuit of equal rights and dignity for homeless individuals.

19.     On the morning of September 23, 2018, Mr. Loma and Mr. Whitney were in the Sixteenth Street Mall with a coalition of advocates distributing meals to the homeless on a public sidewalk outside of Corner Bakery, located at 500 16th Street, Denver, Colorado. The meal distribution was coupled with a peaceful protest calling for an end to the criminalization of homeless individuals.

20.     Plaintiffs' friend, Caryn Sodaro was distributing meals and protesting when she was stopped and arrested for trespass. Ms. Sodaro stated that she was never made aware of a trespass notice that prevented her from being on the property. Plaintiffs were concerned to see Ms. Sodaro being arrested. Many DPD officers were dispatched and present during Ms. Sodaro's arrest, including Defendants Guzman, Kitchens, and Felsoci.

21.     When Ms. Sodaro was being escorted in handcuffs to the patrol vehicle, Mr. Whitney walked with Ms. Sodaro to the patrol vehicle to ensure her safe treatment as she was being detained. Mr. Whitney did not obstruct the officers' investigation.

5

22.     After witnessing the injustice of Ms. Sodaro's arrest, around 11:00 a.m., Mr. Loma continued his protest on the Sixteenth Street Mall against the criminalization of poverty and the inhumane treatment of homeless individuals. Mr. Loma protested alone while walking through the pedestrian walkway in the 400-500 block of the Sixteenth Street Mall.

23.     Throughout Mr. Loma's protest, Defendants Guzman, Kitchens, and Felsoci, having been nearby for the arrest of Ms. Sodaro, were present within the 400-500 block of the Sixteenth Street Mall, observing and listening to Mr. Loma.

24.     As Mr. Loma walked, he announced, "what we have here folks, is an extension of the laws that criminalize people who can't pay rent. They don't want your tourist dollars to recognize that we have problems in this city! The laws say that if you're not paying money, you can't sit down. There's no water, there's no toilets!"

25.     Throughout Mr. Loma's protest, Mr. Whitney stayed in the general vicinity of Mr. Loma, observing his protest.

26.     At all times, Plaintiffs remained on public sidewalks (or public, pedestrian walkways) on the Sixteenth Street Mall.

27.     Mr. Loma had been protesting for about two minutes when he shouted, "fuck the police!" After hearing this statement, Defendant Kitchens said to Defendant Guzman, "isn't that disturbing the peace?" Defendant Guzman ambivalently replied yes.

28.     Mr. Loma continued protesting about the low wages of RTD workers and the criminalization of the homeless. He then shouted, "seven million dollars and these fuckers [inaudible] turn over the homeless…" That was the second and last time Mr. Loma used profanity during his protest.

29.     Mr. Loma continued protesting for fair treatment of the homeless.

30.     Mr. Loma did not say any fighting words. Put differently, his words were not calculated to provoke an immediate breach of the peace or a violent reaction.

31.     Dining outside on the patio of Earls Kitchen and Bar located at 1600 Glenarm Street was a couple with their young child. The patio of Earls protrudes onto the public sidewalk where there is an estimated three-foot tall, clear, glass separator between the sidewalk and the patio tables. Any individual walking on the public sidewalk within viewing angle of the patio, including standing on the other side of the median walkway, can see patio patrons in public view. Passerby can walk on the public sidewalk directly next to patrons dining on the patio, and patio-dining patrons are in close proximity to the sights and sounds of the bustling Sixteenth Street Mall.

32.     Annoyed by Mr. Loma's shouting and few utterances of profanity, the couple dining on the patio of Earls shouted at Mr. Loma to stop cussing because their child was with them.

33.     At no point in time did Mr. Loma say anything directly to the couple, nor did he acknowledge the couple or threaten them in any way.

34.     Upon hearing the couple complain and shout at Mr. Loma, Defendant Guzman stated to Defendant Kitchens, "that's all we need"—insinuating that a citizen complaint for Mr. Loma's protest would provide the probable cause needed to justify Mr. Loma's arrest. Defendant Guzman then said to Defendant Kitchens, "ask them [the couple dining on the patio] if they were offended."

35.     Defendants Guzman, Kitchens, and Felsoci quickly approached Mr. Loma. Defendants Kitchens and Felsoci arrested Mr Loma. Mr. Loma was handcuffed and

cited for disturbing the peace. While placing Mr. Loma in handcuffs, Defendant Kitchens stated, "*now* you can go to jail."

36.     Mr. Loma was arrested by Defendants Guzman, Kitchens, and Felsoci without probable cause to believe that he had committed any crime.

37.     As Mr. Loma was being arrested, the male partner of the couple dining on the patio of Earl's loudly stated to the officers, "get him [Mr. Loma] the fuck out of here."

38.     During Mr. Loma's arrest, Defendant Guzman asked the couple seated on the patio of Earls if they would be willing to sign a complaint against Mr. Loma, to which the couple agreed.

39.     After being put in handcuffs, Mr. Loma was unjustifiably searched by Defendants Kitchens and Felosci. Defendant Guzman watched Mr. Loma being unjustifiably searched, but did nothing to stop Defendants Kitchens and Felsoci from searching him.

40.     Mr. Loma was taken to Denver Justice Center by Defendant Cpl. Adolph Chavez Jr., ("Cpl. Chavez") who was likewise nearby and watched Mr. Loma's protest and subsequent arrest and search while having no reasonable belief or probable cause to believe that Mr. Loma had committed any crime. Despite knowing the arrest was unsupported by probable cause and having many opportunities to intervene, Defendant Cpl. Chavez failed to do anything to stop the unlawful arrest, unconstitutional jailing, and unjustifiable search of Mr Loma. He instead took Mr. Loma to jail.

41.     Mr. Loma spent 36 hours incarcerated before he was released on bond.

42.     Throughout Mr. Loma's police encounter, Mr. Whitney stood on a public sidewalk and/or public pedestrian walkway away from the investigation. As a friend of Mr. Loma's and a concerned public citizen, Mr. Whitney took pictures of Mr. Loma's arrest on his cell phone believing the officers were committing illegal acts of misconduct against Mr. Loma in relatiation for his protected speech.

43.     After Mr. Loma was arrested, Mr. Whitney walked in the direction of the couple still dining on the patio of Earls. Standing on a public sidewalk several yards away from the couple, he stopped and pointed his cell phone in their direction. In his effort to collect evidence regarding the complaints against Mr. Loma and the officers' subsequent unlawful arrest, Mr. Whitney attempted to document the couple and their location by taking a photo of them on the patio.

44.     As Mr. Whitney had his phone pointed toward the couple, Defendants Guzman and Felsoci saw Mr. Whitney and demanded he not to take a picture of them. Mr. Whitney put his phone down and calmly stated that he did not take a picture. Mr. Whitney was in fact unable to take a picture of the couple.

45.     Defendants Guzman and Felsoci told Mr. Whitney that he was harassing the couple. Mr. Whitney attempted to explain that he needed it to gather information about what occurred, but was unable to complete his sentence because an officer was speaking over him. To avoid the hassle, Mr. Whitney calmly stated that he was walking away. In response, Defendant Guzman retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well.

46.     Mr. Whitney walked away. As he walked, he turned and stated, "I did not take a fucking picture."

47.     At no point in time were Mr. Whitney's words or actions calculated to provoke an immediate breach of the peace.

48.     In response to this statement, Defendants Guzman and Felsoci immediately walked up to Mr. Whitney and arrested him without probable cause to believe that Mr. Whitney was about to, or had committed any crime. While arresting Mr. Whitney, Defendant Felsoci told Mr. Whitney to quit swearing.

49.     After being put in handcuffs, Defendant Felsoci escorted Mr. Whitney further down the Sixteenth Street Mall towards the other DPD officers and an empty kiosk where he was then unjustifiably searched by Felsoci.

50.     Mr. Whitney was charged with disturbing the peace and taken to the Denver Justice Center, where hespent 56 hours incarcerated before he was released on bond.

51.     Defendant Michael Daniels was on scene and witnessed the incident and subsequent arrest and search of Mr. Whitney, and had no reasonable belief or probable cause to believe that Mr. Whitney had committed any crime.

52.     Despite knowing the arrest was unsupported by probable cause and having many opportunities to intervene, Defendant Daniels failed to do anything to stop the unlawful arrest, unjustifiable search, and unconstitutional jailing of Mr Whitney.

53.     Hinging on Defendant Lieutenant Kenneth Chavez's ("Lt. Chavez") approval, Lt. Chavez, a supervisor of the other Defendants, was radioed by another Defendant and told about the situations surrounding Mr. Loma's and Mr. Whitney's First Amendment activities, their subsequent charges, arrests, searches, and detainment, and the citizen complaints obtained in support of their arrests.

10

54.     Based on what he was told, Defendant Lt. Chavez knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights.

55.     Despite this knowledge, Defendant Lt. Chavez gave his express approval to the Defendants for Mr. Loma's and Mr. Whitney's charges, arrests, searches, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

56.     Both charges against the Plaintiffs were ultimately dismissed. Mr. Loma's charge was dismissed on February 6, 2019 and Mr. Whitney's charge was dismissed on January 24, 2019.

57.     Mr. Loma was engaged in protected First Amendment activity when he protested injustices the homeless experience as he walked up and down public sidewalks in the Sixteenth Street Mall.

58.     Mr. Whitney was engaged in protected First Amendment activity when he attempted to document the complaining couple and their surroundings in public while standing on a public sidewalk for the purpose of gathering evidence of the circumstances surrounding what he believed to be police misconduct for Mr. Loma's protected speech.

59.     Both Mr. Loma and Mr. Whitney were speaking out on a matter of public concern. Mr. Loma's protestations about the treatment of homeless individuals touches on significant political, social, and economic issues. Mr. Whitney's documenting of

how DPD officers conduct arrests, and the bases for those arrest, also centers on issues of important political and social concern.

60.     Defendants' actions and arrest of Plaintiffs were motivated by their desire to prevent Plaintiffs from exercising their First Amendment rights.

61.     Defendants arrested Mr. Whitney and Mr. Loma based on the content of their speech. Had they said a word other than "fuck" they would not have been arrested.

62.     Defendants also arrested Mr. Whitney and Mr. Loma based on the viewpoint of their speech. Had they shouted messages supporting the police or Denver's treatment of its homeless residents, they would not have been arrested. This is evidenced by the fact that one of the patrons of the restaurant who signed the complaint against them also said the word "fuck" but was not so much as threatened with arrest.

63.     By charging Plaintiffs with crimes without any legal basis to do so, Defendants participated in the malicious prosecution of Plaintiff. Defendants were motivated by an improper purpose to punish Plaintiffs in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

64.     Defendants engaged in all of their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

65.     Defendant City and County of Denver ("Denver") has an informal custom or practice of condoning unlawful arrests and other acts of retaliation by its officers that is based solely on the exercise of First Amendment rights.

66.     For instance, on July 5, 2018, Susan Greene, a journalist, was driving to the bank when she saw a black man handcuffed and naked on the sidewalk across from

the State Capitol Building surrounded by DPD officers. Concerned as a public citizen and journalist by the questionable appearance of an African-American man unclothed, unthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take pictures on a public sidewalk where she was not obstructing police investigation. DPD officers told her to stop. Ms. Greene stated that it was a public sidewalk and that she had the right to take photos. The officers falsely accused Ms. Greene of violating the arrestee's HIPAA rights and of blocking the door to an ambulance. The officers then forcefully and painfully arrested Ms. Greene in retaliation for exercising her First Amendment right to photograph the police on a public sidewalk, and handcuffed her for ten minutes before releasing her. Ms. Greene was never charged with a crime. Ms. Greene's First Amendment, First Amendment retaliation, and Fourth Amendment excessive force claims against Denver and DPD officers were settled in August 2019 for $50,000 in addition to mandating First Amendment training for DPD officers.

67. On August 14, 2014, Levi Frasier witnessed DPD officers punch an unarmed civilian numerous times in the head and trip a heavily pregnant woman, causing her to fall to the ground. Believing the officers were committing illegal acts of misconduct, Mr. Frasier video-recorded the officers with his tablet. Upon seeing Mr. Frasier recording, DPD officers surrounded Mr. Frasier, threatened him with arrest, and demanded he turn over his video. Mr. Frasier refused, and a DPD officer seized his tablet from him and searched it illegally. On the plaintiff's motion to reconsider, Judge Blackburn of the U.S. District Court for the District of Colorado reinstated the plaintiff's First Amendment retaliation claims against the officer defendants and granted Denver's motion for summary judgment. Despite Denver's policy and training

on the First Amendment, the officers nonetheless violated Mr. Frasier's First Amendment right to gather and record information on matters of public concern.

68.     On September 23, 2018, shortly before Mr. Loma and Mr. Whitney's arrests, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Her case is currently ongoing.

69.     On September 24, 2018, a day after Ms. Sodaro, Mr. Loma, and Mr. Whitney were arrested, Eric Brandt was in the Sixteenth Street Mall protesting their arrests. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Defendant Kitchens, Defendant Cpl. Chavez, and three other officers were present and closely watching Mr. Brandt. Defendant Kitchens expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. Defendants Kitchens and Cpl. Chavez then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. Upon making the arrest, Defendant Cpl. Chavez radioed Defendant Guzman explaining that they had Mr. Brandt in custody and that a private citizen was willing to sign a complaint against him. Guzman explained that as long as

they had one signed complaint against him, then the arrest was ok. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018.

70.     On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the plaintiffs' First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kinds against persons engaging in peaceful protest.

71.     In addition to the brutalization of protestors, DPD officers have also repeatedly used unlawful, excessive force against journalists in violation of the First Amendment. On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Braodcastors Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected the to use of force by DPD officers while reporting on protests in Denver. DPD officers hit these reporters and with pepper balls,

projectiles, or tear gas simply for being present at protests in violation of the First Amendment.

72.     Given Denver's history and widespread practice of unlawful arrests and excessive force in retaliation against the exercise of First Amendment rights, Defendant Denver knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise DPD officers on the protections of the First Amendment violations.

73.     Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to the policy and custom of failing to provide additional or better training and supervision to DPD officers regarding the protections of First Amendment.

74.     Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

75.     Defendant Denver's custom, practice, and policy of encouraging, condoning, and ratifying the use of arrests or other retaliatory conduct against those who exercise their First Amendment rights, and their custom, policy, and practice of failing to properly train, supervise, and discipline DPD employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of the violations of Plaintiffs' constitutional rights.

76.    Defendant Denver engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

77.    Defendant Denver's acts or omissions caused Plaintiffs' damages through their deprivation of liberty through retaliatory arrest and incarceration, and where they suffered mental pain, humiliation, fear, anxiety, loss of enjoyment of life, and sense of security and individual dignity, among other injuries, damages, and losses.

**STATEMENT OF CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – First Amendment*
*Free Speech Violation*
(Against All Defendants)

78.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

79.    At all times relevant to this Complaint, Defendants were acting under the color of law.

80.    The right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment to the Constitution of the United States.

81.    Uttering profanity at a police officer is speech protected by the First Amendment to the Constitution of the United States.

82.    Speaking on matters of public concern while standing on a public sidewalk, without interfering with law enforcement operations, is speech protected by the First Amendment to the Constitution of the United States.

83.     Observing and recording law enforcement activities or activities of members of the public as is related to law enforcement misconduct, while standing on a public sidewalk, without interfering with any law enforcement activity, is a legitimate means of gathering and disseminating information for the purpose of petitioning the government for redress of grievances, and is therefore speech protected by the First Amendment to the Constitution of the United States.

84.     Citizens outside in public, or, more specifically, dining on a patio in the middle of a busy, pedestrian mall have no reasonable expectation that their conduct will be private, their dining experience uninterrupted by persons or sounds in the Sixteenth Street Mall, or that their identities will not possibly be recorded, published, or disseminated in some form.

85.     When Plaintiffs were arrested and charged, they were standing in the middle of the Sixteenth Street Mall on a public sidewalk, a traditional public forum, in Denver, Colorado.

86.     Neither Plaintiff violated any law in speaking on matters of public concern, or by attempting to take a photo of public activity from a public sidewalk.

87.     Defendants did not at any time have a reasonable basis for believing that Plaintiffs were using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiffs were using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

88.     Mr. Loma was arrested by Defendants Guzman, Kitchens, and Felsoci because of his First Amendment protected activity.

18

89.     Defendant Cpl. Chavez was on scene and watching Mr. Loma's protest and subsequent arrest, but failed to intervene in the unlawful arrest, unconstitutional jailing, and unjustifiable search of Mr. Loma, despite knowing that Defendants Guzman, Kitchens, and Felsoci were arresting Mr. Loma based on his protected First Amendment activity, and despite having opportunities to intervene.

90.     Mr. Whitney was arrested by Defendants Guzman and Felsoci because of his First Amendment protected activity.

91.     Defendant Daniels was on scene and watched the interaction between Mr. Whitney and the Defendant officers, including his subsequent arrest and search, but failed to intervene in the First Amendment violation against Mr. Whitney, despite knowing that Defendants Guzman and Felsoci were arresting Mr. Whitney based on his protected First Amendment activity, and despite having opportunities to intervene.

92.     Defendant Lt. Chavez supervised the other Defendants and knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights. Despite this knowledge, Lt. Chavez gave his express approval for Mr. Loma's and Mr. Whitney's charges, arrests, searches, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

93.     Defendants' arrests of Plaintiffs because of their First Amendment protected activity constitutes a content-based or viewpoint-based restriction on speech, or both.

94.     Defendants' arrests of Plaintiffs was a denial of their right to free speech guaranteed by the First Amendment to the Constitution of the United States.

95.     By arresting Plaintiffs and charging them with crimes without probable cause, Defendants prevented Plaintiffs from speaking, observing, reporting on, documenting, and disseminating information relating to a matter of public concern.

96.     By arresting and jailing Plaintiffs, Defendants prevented Plaintiffs, and chilled them both, from exercising their First Amendment rights.

97.     The actions of Defendants occurred while each was acting under color of State law.

98.     Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known. The freedom of individuals to oppose or challenge police action, and to criticize public officials, has been clearly established for over thirty years. *City of Houston v. Hill*, 482 U.S. 451 (1987). The right to photograph and record police activity is clearly established. *Fields v. City of Phila.*, 2017 U.S. App. LEXIS 12159 (3d Cir. July 7, 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 Fed. App'x 857, 863 (11th Cir. 2014) ("Citizens have 'a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct.'" (quoting *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000))); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("the Constitution protects the right of individuals to videotape police officers performing their duties in public"); *Adkins v. Limtiaco*, 537 Fed. App'x 721, 722 (9th Cir. 2013) (holding that allegations that plaintiff was arrested in retaliation for taking photos of the police in public stated a claim for First Amendment retaliation); *Alvarez*, 679 F.3d at 599–600 (holding that a statute that would prohibit recording

20

police officers with a cell phone violated the First Amendment); *Glik*, 655 F.3d at 79 (holding "unambiguous" the constitutional right to videotape police activity); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999) (holding that filming public officials in a public area "was done in the exercise of [Plaintiff's] First Amendment Rights"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (holding that recording of police conduct fell within the "First Amendment right to film matters of public interest"); *see also Schnell v. City of Chicago*, 407 F.2d 1084, 1085–86 (7th Cir. 1969) (reversing dismissal of action by news photographers who covered demonstrations at the 1968 Democratic National Convention in Chicago against the police for "interfering with plaintiffs' constitutional right to . . . photograph news events").

99.     Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

100.     Defendants acted pursuant to the custom, policy, and practice of Defendant City and County of Denver, which condones, tolerates, and ratifies its law enforcement officers' conduct of violating First Amendment rights. Defendants' violation of Plaintiffs' First Amendment rights was in accordance with an informal custom and widespread practice of violating First Amendment rights in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

101.     Defendant Denver was aware of its employees' widespread violations of First Amendment rights, as detailed above, and failed to properly train, supervise, or discipline its employees regarding the First Amendment and First Amendment violations.

102.    Defendant Denver knew, or should have known, that its employees would violate First Amendment rights and would arrest, search, and cite Plaintiffs, violating their constitutional rights.

103.    Defendant Denver's policies, customs, or practices condoning its employees' violation of First Amendment rights was the moving force and proximate cause of the violation of Plaintiffs' constitutional rights

104.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, and they were prevented from reporting and disseminating information on a matter of public concern, among other injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
*42 U.S.C. § 1983 – First Amendment*
*Retaliation*
(Against all Defendants)

105.    Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

106.    At all times relevant to this Complaint, Defendants were acting under the color of law.

107.    Plaintiff Loma was engaged in First Amendment protected activity by speaking on matters of public concern while standing on a public sidewalk, a traditional public forum, without interfering with law enforcement operations.

108.    Plaintiff Whitney was engaged in First Amendment protected activity by gathering, receiving, recording, and disseminating information on matters of public

importance. This included observing and recording law enforcement activities or activities of members of the public as was related to law enforcement misconduct, while standing on a public sidewalk, without interfering with any law enforcement activity.

109.    Plaintiffs' speech and expression were related to matters of public concern and did not violate any law.

110.    Defendants did not at any time have a reasonable basis for believing that Plaintiffs were using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiffs were using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

111.    Defendants responded to Plaintiffs' First Amendment-protected activity with retaliation by handcuffing, arresting, charging them with disturbing the peace, and booking them into jail. They were arrested and detained without probable cause to believe that they had engaged in any illegal activity.

112.    Mr. Loma was arrested and charged by Defendants Guzman, Kitchens, and Felsoci in retaliation for his First Amendment protected activity.

113.    Defendant Cpl. Chavez, was on scene and watching Mr. Loma's protest and subsequent arrest, but failed to intervene in the stop the unlawful arrest, unconstitutional jailing, and unjustifiable search of   Mr. Loma, despite knowing that Defendants Guzman, Kitchens, and Felsoci were retaliatorily arresting and searching Mr. Loma based on his protected First Amendment protected activity, and despite having opportunities to intervene.

114.    Mr. Whitney was arrested and charged by Defendants Guzman and Felsoci in retaliation for his First Amendment protected activity.

115.    Defendant Daniels was on scene and watched the interaction between Mr. Whitney and the Defendant officers, including his subsequent arrest, but failed to intervene in the First Amendment Retaliation against Mr. Whitney, despite knowing that Defendants Guzman and Felsoci were retaliatorily arresting and charging Mr. Whitney based on his protected First Amendment activity, and despite having opportunities to intervene.

116.    Defendant Lt. Chavez supervised the other Defendants and knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, and detainment were a violation of their First and Fourth Amendment rights. Despite this knowledge, Lt. Chavez gave his express approval for Mr. Loma's and Mr. Whitney's charges, arrests, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

117.    Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights.

118.    By unlawfully arresting, charging, and booking Plaintiffs into jail, Defendants sought to punish Plaintiffs for exercising their First Amendment rights, to silence their future speech, and restrict their freedom of expression, and the future speech and expression of others. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in First Amendment-protected activity.

24

119.   Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

120.   Defendants lacked probable cause to arrest Plaintiffs.

121.   Even if Defendants possessed probable cause to arrest Plaintiffs, Defendants actions fall neatly within the exception clealy established in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).

122.   Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

123.   Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

124.   Defendant Denver was aware of widespread retaliation by its law enforcement officers against individuals exercising their First Amendment rights, as detailed above, and failed to properly train, supervise, or discipline its employees regarding the First Amendment and First Amendment violations.

125.   Defendant Denver knew, or should have known, that their employees would retaliate against those exercising First Amendment rights and would retaliate in arresting and charging Plaintiffs, violating their constitutional rights.

126.   Defendant Denver's policies, customs, or practices condoning its employees' retaliation against individuals who exercise their First Amendment rights was the moving force and proximate cause of the violation to Plaintiffs' constitutional rights.

127.   Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, and they were prevented from reporting and disseminating information on a matter of public concern, among other injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Fourth Amendment*
*Unlawful Seizure / False Arrest*
(Against All Defendants)

128.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

129.   At all times relevant to this Complaint, Defendants were acting under the color of law.

130.   Defendants did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiffs had committed or were committing any violation of the law prior to seizing and detaining them and continuing to restrain them.

131.   Defendants did not at any time have a reasonable basis for believing that Plaintiffs were using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that

Plaintiffs were using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

132.    Defendants did not at any time have a warrant authorizing any such seizure and detention of Plaintiffs' bodies or their belongings.

133.    Mr. Loma was unlawfully seized by Defendants Guzman, Kitchens, and Felsoci without probable cause to believe that Mr. Loma was about to, or had committed any crime.

134.    Defendant Cpl. Chavez was on scene and watching Mr. Loma's protest and subsequent arrest, but failed to intervene in the unlawful arrest, unconstitutional jailing, and unjustifiable search of Mr. Loma, despite knowing that Defendants Guzman, Kitchens, and Felsoci were unreasonably arresting Mr. Loma without probable cause, and despite having opportunities to intervene.

135.    Mr. Whitney was arrested by Defendants Guzman and Felsoci without probable cause to believe that Mr. Whitney was about to, or had committed any crime.

136.    Defendant Daniels was on scene and watched the interaction between Mr. Whitney and the Defendant officers, including his subsequent arrest and search, but failed to intervene in the unlawful seizure of Mr. Whitney, despite knowing that Defendants Guzman and Felsoci were unreasonably arresting Mr. Whitney without probable cause, and despite having opportunities to intervene.

137.    Defendant Lt. Chavez supervised the other Defendants and knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights. Despite this knowledge, Lt. Chavez gave his express

approval for Mr. Loma's and Mr. Whitney's charges, arrests, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

138.   Defendants, acting in concert with one another, seized and detained Plaintiffs and took them to Denver Justice Center on charges of disturbing the peace, where Plaintiff Loma remained incarcerated for 36 hours and Plaintiff Whitney remained incarcerated for 56 hours.

139.   At the time when Defendants arrested Plaintiffs without probable cause and searched their persons without reasonable suspicion, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in their persons from unreasonable searches and seizures.

140.   Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies its employees' arrests which lack probable cause and are based solely on lawful First Amendment conduct. Defendants' retaliatory arrests, which lacked probable cause and are based solely on lawful First Amendment conduct, were in accordance with an informal custom and widespread practice of unlawful arrests in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

141.   Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

142.   Defendant Denver was aware of widespread continued arrests, which lacked probable cause and are based solely on lawful First Amendment conduct, as

detailed above, and failed to properly train, supervise, or discipline its employees regarding the Fourth Amendment.

143.    Defendant Denver knew, or should have known, that their employees would continue to effectuate arrests that lack probable cause and are based solely on lawful First Amendment conduct, and that this practice would cause Plaintiffs' arrests.

144.    Defendant Denver's policies, customs, or practices condoning its employees' continued arrests, which lack probable cause and are based solely on lawful First Amendment conduct, was the moving force and proximate cause of the violation of Plaintiffs' constitutional rights.

145.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, and they were prevented from reporting and disseminating information on a matter of public concern, among other injuries, damages, and losses.

**FOURTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983*
*Fourth Amendment Violation – Unlawful Search of Person*
(Against all Individual Defendants)

146.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

147.    Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

148.    Plaintifs have a legitimate expectation of privacy in their bodies and their property being free from unreasonable governmental search.

149.    Defendants did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiffs had committed or were committing any violation of the law prior to seizing and detaining them and continuing to restrain them.

150.    Mr. Loma was unlawfully searched by Defendants Kitchens and Felsoci who had no reasonable suspicion to search Mr. Loma nor probable cause to believe that Mr. Loma had committed any crime for the underlying arrest.

151.    Defendant Guzman watched Defendants Kitchens and Felsoci search Mr. Loma and did nothing to stop them, despite knowing there was no reasonable suspicion to search Mr. Loma nor probable cause to believe that Mr. Loma had committed any crime for the underlying arrest.

152.    Despite having opportunities to intervene, Defendant Cpl. Chavez, who was on scene and watching Mr. Loma's protest, arrest, and subsequent search, failed to intervene in the unlawful search, despite knowing that Defendants Kitchens and Felsoci were unreasonably searching Mr. Loma without reasonable suspicion, or probable cause for his underlying arrest.

153.    Mr. Whitney was unreasonably searched by Defendants Guzman and Felsoci who had no reasonable suspicion to search Mr. Whitney nor probable cause to believe that he had committed any crime for the underlying arrest.

154.    Defendant Daniels was on scene and watched the interaction between Mr. Whitney and the Defendant officers, including his subsequent arrest and search, but failed to intervene in the unlawful search of Mr. Whitney, despite knowing that

Defendants Guzman and Felsoci were unreasonably searching Mr. Whitney without reasonable suspicion, or probable cause for his underlying arrest.

155.    Defendant Lt. Chavez supervised the other Defendants and knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights. Despite this knowledge, Lt. Chavez gave his express approval for Mr. Loma's and Mr. Whitney's charges, arrests, searches, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

156.    Defendants did not at any time have a warrant authorizing any such seizure and detention of Plaintiffs' bodies or their belongings.

157.    Because Defendants' underlying arrests of Plaintiffs were unsupported by probable cause and thereby unlawful, Defendants' subsequent search of Plaintiffs, without independent legal justification for the search, was also unlawful.

158.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

159.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, and they were prevented from reporting and disseminating information on a matter of public concern, among other injuries, damages, and losses.

## FIFTH CLAIM FOR RELIEF
*42 U.S.C § 1983*
*Malicious Prosecution - 14TH Amendment Violation*
(Against all Individual Defendants)

160.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

161.    Defendants did not at any time have a reasonable basis for believing that Plaintiffs were using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiffs were using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

162.    Defendants, acting without probable cause, procured groundless charges of disturbing the peace against Plaintiffs in order to maliciously bring about Plaintiffs' criminal prosecution. This includes supervisory Defendant Lt. Chavez, who knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights. Despite this knowledge, Lt. Chavez gave his express approval for Mr. Loma's and Mr. Whitney's charges, arrests, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

163.    Defendants, acting knowingly, maliciously, willfully and wantonly, and evincing a complete and utter disregard for the First Amendment, participated in the institution of legal proceedings against Plaintiffs, including promoting the continued criminal prosecution of Plaintiffs with knowledge that there were no reasonable grounds to believe that Plaintiffs had committed any crime whatsoever.

164.    Defendants acted knowingly, maliciously, willfully and wantonly by accusing Plaintiffs of unlawful behavior prior to, and during their unlawful arrests.

165.    Without any legal basis to do so, Defendants participated in the malicious prosecution of Plaintiffs.

166.    Mr. Loma spent 36 hours incarcerated before he was released on bond. Mr. Whitney spent 56 hours incarcerated before he was released on bond.

167.    Both charges of disturbing the peace against the Plaintiffs were ultimately dismissed. Mr. Loma's charge was dismissed on February 6, 2019 and Mr. Whitney's charge was dismissed on January 24, 2019.

168.    Defendants were motivated by an improper purpose to punish Plaintiffs in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

169.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

170.    As a direct result of Defendants' unlawful action as described above, Plaintiffs suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

  a.  Declaratory relief and injunctive relief, as appropriate;

  b.  Actual economic damages as allowed by law and as established at trial;

  c.  Compensatory damages as allowed by law, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

  i.  Issuance of a formal written apology from each Defendant to Plaintiff;

  ii.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

  iii.  Mandatory training designed to avoid future similar misconduct by Defendants;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney's fees and costs; and

h.  Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 17th day of September, 2020.

KILLMER, LANE & NEWMAN, LLP

s/ David Lane
David A. Lane
Helen Oh
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com

*ATTORNEYS FOR PLAINTIFFS*